IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM DeFORTE, | ) |
| | ) |
| Plaintiff, | ) |
| Vs | ) |
| | ) Civil Action No. 2:13 cv 356 |
| THE BOROUGH OF WORTHINGTON; | ) |
| | ) |
| KEVIN FEENEY, Individually and as Mayor of the Borough of Worthington; | ) |
| | ) |
| BARRY ROSEN, Individually and as a member of Council of the Borough of Worthington and in his capacity as elected constable for the Borough of Worthington and in his capacity as Public Safety Director for the Borough of Worthington; and | ) |
| | ) |
| GERALD RODGERS, Individually and as a police officer of the Borough of Worthington | ) |
| | ) |
| Defendants | ) |

## SECOND AMMENDED COMPLAINT

**AND NOW COMES THE PLAINTIFF, WILLIAM DeFORTE**, by and through his attorneys, Craig H. Alexander and Bruce E. Dice & Associates, P.C. and hereby amends count IV of Plaintiff's Complaint as follows:

### JURISDICTION

1. This is an action for money damages brought pursuant to 42 U.S.C. §§1983, 1986 and 1988 in the Fourth and Fourteenth Amendment to the United States Constitution.

2. This is an action for money damages brought pursuant to 42 U.S.C. §§1983, 1986 and 1988 in the Fourth and Fourteenth Amendment to the United States Constitution

JURY TRIAL DEMANDED

3. The jurisdiction of this court is predicated on 28 U.S.C. §§1331, 1342(a)(3), 1343(1)(2)(3)(4) as well as the foregoing statutory and constitutional provisions together with supplemental jurisdiction of this court under 28 U.S.C. §1367(a).

4. This is an action for money damages brought pursuant to 42 U.S.C. §§1983, 1986 and 1988 in the Fourth and Fourteenth Amendment to the United States Constitution.

## PARTIES

5. Plaintiff, WILLIAM DeFORTE, (Hereinafter sometimes referred to as Chief DeForte) is an adult individual with an address of 1120 Clinton Road, Box 385, Clinton PA 15026.

6. The Defendant, THE BOROUGH OF WORTHINGTON, (hereinafter sometimes referred to as Worthington, Worthington Borough or the Borough of Worthington) is a Pennsylvania Borough and Body Politic organized under and subject to the Pennsylvania Borough Code.  Worthington has an office and principal place of business with a address of 206 Church Street, PO Box 66, Worthington, PA  16262.

7. The Defendant KEVIN FEENEY (hereinafter referred to as "Mayor Feeney" is an individual and Mayor of the Worthington Borough.

8. The Defendant BARRY ROSEN (hereinafter referred to as "Councilperson Rosen" is individual and member of Council of Worthington Borough.  Councilperson Rosen is also an elected Constable in the Borough of Worthington as well as Public Safety Director.

9. The Defendant GERALD RODGERS (hereinafter referred to as "Officer Rodgers" is an individual and current Chief of Police of Worthington Borough.

JURY TRIAL DEMANDED

## BACKGROUND

10. Chief DeForte is a 42 year old adult individual who, at all times pertinent herein was the Chief of Police or deposed Chief of Police of Worthington Borough.

11. Chief DeForte began his career as a member of the Worthington Borough Police Office when he was hired on or about July 23, 2009.

12. Chief DeForte was promoted to the position of Assistant Chief on or around the 8th day of September, 2009 by unanimous vote of the Council of the Borough of Worthington.

13. Chief DeForte was promoted to the position of Chief of Police on March 9, 2010 by unanimous vote of the Council of the Borough of Worthington.

14. Chief DeForte, according to minutes of the November 5, 2012 Council Meeting, was suspended from his duties as Chief of Police on Friday, October 26, 2012 until the next Council meeting scheduled for November 5, 2012 "for insubordination and other possible offenses." (See official minutes of the Worthington Borough Council meeting of November 5, 2012).

15. On November 5, 2012, Chief DeForte was terminated from his position as Chief of Police for the Borough of Worthington.

16. Chief DeForte was told he was not permitted to attend the Council Meeting of November 5, 2012.

17. At the time of the suspension and termination, the Worthington Police Department had five members.

18. During his tenure with Worthington Borough, Chief DeForte had an exemplary record with no prior disciplinary events.

JURY TRIAL DEMANDED

19. However, Chief DeForte often clashed with both Council Member Rosen and Mayor Feeney over issues pertaining to the operation of the Police Department.

20. For instance, Chief DeForte repeatedly advised Council Member Rosen and Mayor Feeney that it is unlawful for a quota system to be imposed upon the officers for the writing of traffic citations.

21. Both Mayor Feeney and Councilperson Rosen were often overheard telling the rank and file of the police department that they had to earn their salary through ticket writing and if they wanted a new cruiser, they had to write enough tickets to purchase one.

22. Chief DeForte also clashed with Councilperson Rosen on his unlawful use of police powers when acting in his capacity as Elected Constable.

23. On more than one occasion, Councilperson Rosen has engaged lights on his unmarked police vehicle and effectuated traffic stops using the color of his authority as Constable.

24. On more than one occasion, Councilperson Rosen has engaged lights on his unmarked police vehicle to direct traffic and for parades and other events held within the Borough.

25. Chief DeForte admonished Councilperson Rosen that doing so violates the law and risks endangering proper arrests of those that Rosen attempted to stop.

26. In addition, in late October Chief DeForte became aware of a situation when Mayor Feeney removed, with no authorization, 5 radios from the Worthington West Franklin Fire Department.

JURY TRIAL DEMANDED

27. On October 24, 2010, Chief DeForte confronted Mayor Feeney regarding his theft of the radios from the fire company.

28. Mayor Feeney acknowledged taking the radios and asked if Chief DeForte was investigating him.

29. It was during this conversation that Chief DeForte again referenced the improper citation practices.

30. Chief DeForte told Mayor Feeney that he [Mayor Feeney] could not be a thief and work for the public interest.

31. Mayor Feeney promised to return the radios; however, it is unknown if Mayor Feeney ever did so.

32. Additionally, during this same conversation, Chief DeForte questioned Mayor Feeney on his use of a police emergency equipment grant to repair red lights in and out of Worthington Borough.

33. There was no council action approving the use of the grant money for this purpose and the action did not benefit the police department but rather the fire company where Mayor Feeney was also a Fire Chief.

34. In addition, during this conversation, Chief DeForte questioned Mayor regarding his illegal seizure of keys from a riding lawnmower which belonged to Worthington Borough resident John Eppinger.

35. Mr. Eppinger was cutting grass at the time Mayor Feeney seized his keys and prevented him from cutting his grass.

36. Two days later on October 26th, Mayor Feeney removed the police computer and the hard drive from the police department.

JURY TRIAL DEMANDED

37. When Chief DeForte learned of this, he attempted to contact Mayor Feeney about the removal of the computer but Mayor Feeney would not accept his calls.

38. Chief DeForte contacted Councilperson Rosen, who denied knowing the computer was removed.

39. Chief DeForte worked the remainder of the day, including the trick or treat event that night.

40. At the conclusion of the night, Chief DeForte was present at the police department with Officer Rodgers, Officer Nicolle Traister and Dave Conoran (Borough Secretary) when Chief DeForte told them that the police department cannot function the way the Mayor and Council runs it and suggested that maybe they should quit.

41. Officer Rogers said he had a five year plan and left the building.

42. Within five minutes, Mayor Feeney appeared at the station with Councilperson Rosen who was in full constable uniform and appeared to be acting in his capacity as constable.

43. Upon entering, The Mayor threw his jacket and got in Chief DeForte's face and acknowledged that he took the computer.

44. Mayor Feeney threatened to report Chief DeForte to the ATF on a firearm issue.

45. Mayor Feeney told Chief DeForte that he was suspended and to collect his personal belongings and "get the f*ck out."

46. Mayor Feeney left and Councilperson Rosen remained.

47. Councilperson Rosen advised Chief DeForte that if he removes any Borough property, the Borough will perform "a two year audit" on Chief DeForte.

48. Councilperson Rosen stated "not to be ignorant but if you brought it you lost it."

JURY TRIAL DEMANDED

49. Councilperson Rosen ended the conversation with the statement "trust me we will find something."

50. Thereafter on October 28, 2012, Mayor Feeney contacted Chief DeForte threatening to press charges against him for theft and demanded that if Chief DeForte did not bring back what Mayor Feeney alleged was missing he would "start making calls."

51. Thereafter, the Mayor's wife contacted Chief DeForte and left a threatening message.

52. Later that day, Chief DeForte was contacted by Trooper Zendarsky of the Pennsylvania State Police, Kittanning Barracks and advised Chief DeForte that he was contacted by Mayor Feeney and wanted to hear Chief DeForte's side.

53. Sometime thereafter, Officer Rogers asked Chief DeForte about an M4 upper half of a weapon Chief DeForte had built for him.

54. Chief DeForte had previously built the upper with his own funds and later sold the upper to Officer Rodgers.

55. Officer Rodgers was now making an allegation that Chief DeForte improperly sold Officer Rodgers a gun that belonged to the Borough.

56. Thereafter, the State Police again contacted Chief DeForte investigating a claim that guns had been removed from the Department.

57. Chief DeForte learned during this investigation that following his suspension on October 26th, someone with access to the Worthington Police Department may have switched the upper on Officer Rodger's gun with the upper on a gun that had been issued to another patrol officer and that patrol officer's gun was now missing.

JURY TRIAL DEMANDED

58. It is believed and therefore averred based on conversation with the state police during a video recorded interview that the manipulated gun was thereafter turned over to the State Police with an allegation that the other gun was missing.

59. When Chief DeForte provided statements to the State Police that they described being in their possession may have been altered by the switching of "uppers" with another patrol weapon prior to it being turned over to the state police, the other "missing" weapon reappeared at the police department.

60. Additionally, on October 30, 2012, Chief DeForte was contacted by the Solicitor Pine Township where he had also recently been hired along with Even Townshend and three other officers and advised that Pine Township was disbanding the force.

61. Chief DeForte had worked with Pine Township for approximately one month putting the force together and October 31st was going to be the first day, with active patrol officers.

62. Chief DeForte learned that on October 30, 2012, Mayor Feeney appeared at Pine Township, went into the police department and, with no authorization from Chief DeForte removed certain belongings.

63. Mayor Feeney apparently advised both Pine Township and the State Police that there was stolen property that belonged to the Borough of Worthington at the Pine Township Police Department.

### COUNT I – Plaintiff v. Worthington Borough
### Violation of Plaintiff's Right to Procedural Due Process, 42 U.S.C. §1983

64. All prior paragraphs of Plaintiff's second amended complaint are hereby incorporated herein by reference as of the same were more fully set forth at length herein.

JURY TRIAL DEMANDED

65. On or about November 5, 2013, Worthington Borough terminated Chief DeForte for what Mayor Feeney alleged was "insubordination or other possible offences".

66. Chief DeForte was advised by the State Police that Mayor Feeney told them that he was not permitted to attend this meeting.

67. Just prior to being terminated at the public meeting on November 5, 2012, the Mayor and Council, allegedly upon recommendation of Solicitor Roger T. Mechling, met in executive session where it is believed and therefore averred that Chief DeForte's suspension and pending termination were discussed.

68. Section 708 of the Pennsylvania Sunshine Law requires notice to the employee that potential discipline may be discussed in executive session and the affected employee has the right to request in writing that the matter be discussed in public.

69. Chief DeForte was not advised that his status would be discussed in executive session, nor was he provided the opportunity to demand that it be discussed in public.

70. To the contrary, Mayor Feeney instructed the State Police to direct Chief DeForte that he was to not even attend the public meeting.

71. The Chief DeForte's rights to a *Loudermill* pre-termination hearing and to a post-termination hearing are clearly established rights.

72. Defendants failed to provide any statement of charges to the Plaintiff prior to being terminated from his position.

73. Plaintiff's right to a statement of charges is a clearly established right.

74. Prior to being suspended by the Mayor immediately prior to termination, Chief DeForte had never been subject to discipline for any reason.

JURY TRIAL DEMANDED

75. To date, Worthington Borough has not informed Chief DeForte why he was discharged, other than the vague statement made at the council meeting, has not provided any statement of charges and opportunity to be heard and has not provided Chief DeForte any due process of law.

76. Prior to being terminated, the plaintiff had a constitutionally protected property interest in his job as Chief of Police which arose from:

    a. The Pennsylvania Borough Code at 53 §§46171 to 46195 which states that a police officer can only be removed for cause; and/or
    b. The Pennsylvania Whistleblower Law which grants public employees who have made a report of wrongdoing the right to procedural due process before termination.
    c. The Worthington Police Department Policy and Procedure Manual.
    d. Worthington Ordinance setting forth a progressive discipline policy.

77. Under federal and state law, a public employee such as Chief DeForte who has a protected property interest in his job has a right to both a pre-termination hearing ("*Loudermill* hearing") and a post-termination hearing before an impartial tribunal.

78. Worthington Borough acted under color of state law to deprive Chief DeForte of his constitutionally protected property right without procedural due process of law.

79. As a result of Worthington's unlawful actions, the plaintiff has suffered lost wages and benefits, embarrassment, humiliation, mental anguish, and loss of self-esteem.

WHEREFORE, plaintiff respectfully requests judgment for:

    a.   Equitable relief reinstating plaintiff with full back pay and benefits;
    b.   Compensation for non-economic damages;
    c.   Attorney fees, costs, and expenses; and,
    d.   Punitive damages
    e.   Other such relief as this court deems appropriate.

JURY TRIAL DEMANDED

### COUNT II – Plaintiff v. All Individual Defendants in their Official and Individual Capacities
### <u>Conspiracy to Violate the Plaintiff's Right to Procedural Due Process/Violation of Borough Code</u>

THIS COUNT HAS BEEN DISMISSED WITH PREJUDICE BY OPINION AND ORDER OF THE COURT DATED DECEMBER 18, 2013.

### COUNT III- Plaintiff v. Worthington Borough
### <u>Pennsylvania Whistleblower Law</u>

80. All prior paragraphs of Plaintiff's Second Amended Complaint are hereby incorporated herein by reference as of the same were more fully set forth at length herein.

81. Chief DeForte was an employee of Worthington Borough, which is subject to the Pennsylvania Whistleblower Law.

82. The Pennsylvania Whistleblower Law provides that no employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

83. The Pennsylvania Whistleblower Law further provides that no employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because he is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.

JURY TRIAL DEMANDED

84. As stated below, Chief DeForte was discharged by the defendants in retaliation for making good faith reports of wrongdoing, which in his position as Police Officer and Officer in Charge he was required to do by law.

85. On numerous occasions, Chief DeForte reported to Worthington Borough officials and Mayor Feeney and Councilperson Rosen particularly, the unlawful nature of Worthington's demand for its officers to write sufficient traffic tickets in order to pay for officer salaries, police equipment and vehicles.

86. Two days before his suspension, Chief DeForte confronted Mayor Feeney regarding Mayor Feeney's theft of radios for the Worthington Police Department.

87. Chief DeForte was suspended just two days after confronting Mayor Feeney regarding his theft of radios from the fire company at which time, Chief DeForte complained again regarding Worthington's unlawful ticketing practices and on the same day as Mayor Feeney and Councilperson Rosen confronted DeForte following Mayor Feeney's removal of the police computer and hard drive from the police station.

88. As a result of the defendants' unlawful conduct, the plaintiff has suffered the loss of his job and is therefore entitled to reinstatement, back wages, full reinstatement of fringe benefits and seniority rights, actual damages, attorney fees, and costs.

JURY TRIAL DEMANDED

## COUNT IV
### Plaintiff v. Mayor Kevin Feeney in his official and individual capacity

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

89. Chief DeForte hereby incorporates by reference all prior paragraphs of this Second Amended Complaint as if the same were more fully set forth at length herein.

90. On or around September of 2012, Chief DeForte was hired as the Commander of Pine Township Police Department and subsequently sworn into office in October of 2012.

91. Chief DeForte's hourly rate with Pine Township was stated to be $15.00 per hour.

92. On or around October 30 or 31st, 2012 it is believed and therefore averred that Mayor Feeney went to the Township of Pine with the purposeful action intending to cause harm to Chief DeForte's business relations in Pine Township.

93. It is believed and therefore averred that Mayor Feeney had a discussion with Pine Township Supervisors, and including Supervisor Clyde Moore regarding Chief DeForte and his termination by Worthington Borough.

94. It is believed and therefore averred that Mayor Feeney made disparaging remarks regarding Chief DeForte and alleged that Chief DeForte stole property, including radios, from Worthington Borough, and was discharged for cause.

95. Mayor Feeney had no justification or legal privilege to make these disparaging remarks or untrue allegations.

96. It is believed and therefore averred that Feeney's purpose was to further damage Chief DeForte's reputation and cause him to be fired from the Pine Township Police Department.

JURY TRIAL DEMANDED

97. As a result of Mayor Feeney's remarks, Pine Tp. either seized or allowed Mayor Feeney to seize Chief DeForte's mountain bike, bayonet, approximately 15 AR-15 magazines, 511 jacket, two military style bags, filing cabinet, metal gun cabinet, stainless steel refrigerator and two cork boards among other personal property belonging to Chief DeForte.

98. Plaintiff believes and therefore avers that following Mayor Feeney's visit to Pine Township, two police radio's were allegedly found at the Pine Twp. Police Department.

99. Prior to the radio's appearance at the Pine Twp. Department, they were previously in the possession of Mayor Feeney.

100. Supervisor Moore then took the radio's to the State Police.

101. Supervisor Moore and Mayor Feeney were in contact via telephone prior to taking the radios to the state police.

102. Mayor Feeney also contacted the state police and told the state police that DeForte had stolen radios.

103. As a result of Mayor Feeney's remarks and conduct, Pine Township met and decided to disband the police force, thereby causing Chief DeForte to lose the income that he would have earned as Police Commander.

104. Chief DeForte believes and therefore avers that Defendants tortuously interfered with his business relations in Pine Township which caused Pine Township to disband its police force.

105. Chief DeForte believes and therefore avers that but for Defendants interference with Pine Township, the police force would not have been disbanded.

JURY TRIAL DEMANDED

106.    In addition, Chief DeForte believes and therefore avers that Defendants continue to attempt to interfere with other business relations.

WHEREFORE, plaintiff requests judgment in his favor, plus interest, costs, punitive damages and attorney fees.

                                                                Respectfully Submitted

                                                                */s/ Craig H. Alexander*

February 18, 2014
_____            _____
Date                                              Craig H. Alexander, Esquire
                                                            Attorney for Plaintiff

JURY TRIAL DEMANDED